UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WCG CLINICAL, INC., | ) | |
| DA VINCI PURCHASER HOLDINGS LP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-01080-JRS-MKK |
| | ) | |
| SITERO, LLC, | ) | |
| ERICKA ATKINSON, | ) | |
| MICHAEL DEMO, | ) | |
| SANKESH ABBHI, | ) | |
| DAVID INGRAHAM, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motion for Preliminary Injunction**

WCG Clinical, Inc. ("WCG") has filed suit against Sitero, LLC ("Sitero"), *et al.*
alleging various claims stemming from the departure of two employees, Ericka
Atkinson and Michael Demo, from WCG to Sitero.  (ECF No. 1.)  WCG subsequently
moved for a preliminary injunction, seeking to, among other things, enjoin Atkinson
and Demo from continuing their employment at Sitero for the remainder of the
twelve-month term enshrined in a set of contentious restrictive covenants.  (ECF No.
8.)  For the reasons outlined below, WCG's motion for a preliminary injunction is
**denied.**

## I.    Legal Standard

To obtain a preliminary injunction, a plaintiff must first show (1) that they have
"some" likelihood of success on the merits; (2) that traditional legal remedies are
inadequate; and (3) that they will suffer irreparable harm without preliminary relief.

*Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). To demonstrate the merits of their claim, a plaintiff must show that their "claim has some likelihood of success on the merits, not merely a better than negligible chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (internal quotation marks omitted) (citing *Eli Lilly and Co. v. Arla Foods, Inc.*, 983 F.3d 375, 381 (7th Cir. 2018)). To show irreparable harm, the moving party must demonstrate that they will suffer "harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr v. Shicker,* 953 F.3d 490, 502 (7th Cir. 2020) (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)).

If the plaintiff proves the three baseline elements, "the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one" and consider "any effects on non-parties" to determine whether a preliminary injunction would be in the public interest. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). Under the Seventh Circuit's "sliding scale" approach, "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818 (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

In weighing the harms, the court must bear in mind that "[a] preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). Moreover, "[a] preliminary injunction ordering the defendant to take an affirmative act rather than merely

refrain from specific conduct is 'cautiously viewed and sparingly issued.'" *Graham v. Med. Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir. 1997)).

## II.    Discussion

Both WCG and Defendants have filed comprehensive briefs complete with dozens of exhibits, each endeavoring to paint the Court a picture of the situation at hand. But the filings tell two different stories.  WCG portrays Atkinson's role at its company as having a central focus, InvestigatorSpace, but with a multi-faceted and global goal involving lots of collaboration with other WCG departments.  (*See* Pl.s' Br. in Supp of Mot. for Prelim. Inj. 5-10, ECF No. 32.)  Meanwhile, Sitero frames the corporate structure of WCG as highly segmented, and Atkinson's role as isolated to the Training & Safety department and the InvestigatorSpace product.  (*See* Defs.' Resp. in Opp'n. to Pl.'s Mot. for Prelim. Inj. 4-7, ECF No. 49.)  WCG alleges that Atkinson and Demo are poised to use trade secrets, proprietary information, and customer goodwill they acquired at WCG to improve Sitero's offerings and ultimately siphon business away from WCG.  (*See* Pl.'s Br. in Supp. of Prelim. Inj. 12-13, ECF No. 32.)  But Sitero argues that Atkinson and Demo's new roles are different and not directly competitive with what they did at WCG, and *any* information or knowledge the pair acquired while at WCG remains only in their minds.  (*See* Defs.' Resp. in Opp'n. to Pl.'s Mot. for Prelim. Inj. 6,8, ECF No. 49.)

Determining whether to issue preliminary injunctive relief involves a highly fact-sensitive inquiry, in which the court considers the entire evidentiary record in determining whether to issue this "extraordinary" remedy.  *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 8 (2008). As discussed, WCG must demonstrate three elements to cross the threshold for a preliminary injunction: 1) some likelihood of success on the merits; 2) irreparable harm if the injunction is denied; and 3) traditional legal remedies are inadequate. If the threshold is met, the Court can proceed to a broader balance-of-harms analysis.

Ultimately, WCG fails to convince the Court on any of the three threshold elements.

i.    Likelihood of success on the merits

In its supporting brief, WCG relies primarily on two allegations to meet the bar for injunctive relief: trade secret misappropriation and breach of contract. Defendants argue that both claims are destined to fail on the merits.

a.  Trade secret misappropriation

WCG alleges that Atkinson and Demo misappropriated trade secrets under the Defend Trade Secrets Act ("DTSA") and the Indiana Uniform Trade Secrets Act ("IUTSA"). (Pl.'s Compl. 26, ECF No. 1.)

Under both statutes, a reviewing court is empowered to grant injunctive relief if the movant succeeds in showing actual or threatened misappropriation of trade secrets. 18 U.S.C. § 1836(3)(A); Ind. Code 24-2-3-3. The elements of a misappropriation claim under both the DTSA and the IUTSA boil down to an "'acquisition of a trade secret' by 'improper means,' or 'disclosure or use of a trade secret' by an unauthorized person meeting certain other conditions." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 484 (7th Cir.*), reh'g and reh'g in banc*

*dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024) (quoting 18 U.S.C. § 1839(5)(A)–(B)); *see also Elevance Health, Inc. v. Mohan*, No. 1:23-cv-01497-SEB-MJD, 2023 WL 6049674, at *7 (S.D. Ind. Sept. 15, 2023) (considering the likelihood of success on the merits of a misappropriation claim under IUTSA and DTSA combined).  WCG claims that Atkinson and Demo are in possession of a variety of confidential information including "(1) pricing strategies and methodologies and financial information; (2) product development details and strategies; and (3) customer information and goodwill."  (Pl.s' Br. in Supp of Mot. for Prelim. Inj. 31, ECF No. 32.)  Defendants do not dispute the categorization of this information as trade secrets, so the Court will assume the assertion as true.  (Defs.' Resp. in Opp'n. to Pl.'s Mot. for Prelim. Inj. 13-14, ECF No. 49.)

As it stands, WCG has provided no evidence in their vast array of exhibits to indicate actual misappropriation—in other words, that Atkinson and/or Demo have either 1) acquired WCG trade secrets in any way other than through ordinary experiences at the company, or 2) used or disclosed these trade secrets after leaving WCG.  WCG's brief does not seem to allege that Atkinson and Demo used "improper means" to acquire trade secrets.  Instead, to support its claim for misappropriation, WCG cites to a decision from this district in arguing that a "risk" of, as opposed to actual, use or disclosure of trade secrets is enough to warrant injunctive relief.  (Pl.s' Br. in Supp of Mot. for Prelim. Inj. 32, ECF No. 32) (citing to *BioConvergence LLC v. Attariwala*, No. 1:19-cv-01745-SEB-TAB, 2019 WL 6893704, at *11 (S.D. Ind. Dec. 18, 2019).)  But this citation is misplaced.  In *BioConvergance,* the defendant *stole*

confidential documents from her former employer, including client project plans, client contact information, supply chain plans, engineering specifications, etc., and that led the Court to find a risk of misappropriation. *Id.* at 10. ("[A]n employee who illicitly takes and retains [her] employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of [its] legal claim.") (quoting *Badger Daylighting Corp. v. Palmer*, No. 1:19-cv-02106-SEB-MJD, 2019 WL 4572798, at *10 (S.D. Ind. Sept. 20, 2019)). Here, WCG does not allege that Atkinson and Demo did anything of the sort.

Ultimately, all WCG can demonstrate is that Atkinson and Demo learned trade secrets through their work at WCG and may refer to whatever information they have retained in their minds while continuing their careers at Sitero. That is not enough to rise to a traditional DTSA or IUTSA misappropriation violation. As a case from this district notes, "mere allegations that former employee possesses proprietary information is [sic] insufficient to plausibly suggest actual disclosure or use of trade secrets." *Elevance Health, Inc.*, 2023 WL 6049674, at *7 (S.D. Ind. Sept. 15, 2023) (citing *LigTel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792, 808 (N.D. Ind. 2020)).

With no concrete evidence of disclosure, acquisition, or use, WCG is relegated to the so-called "inevitable disclosure" theory, to which it limply gestures in various filings. (*See* Pl's Compl. ¶ 76, 78, ECF No.1; Pl.'s Mot. for. Prelim. Inj. ¶ 3, ECF No. 8; Pl.'s Br. in Supp. of Mot. for Prelim. Inj. 33, ECF No. 32.) This theory is premised

on the idea that, given the similarity of the respective companies and positions, Atkinson and Demo cannot help but rely on WCG trade secrets resident in their memory as they continue their careers at Sitero. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995). Recently, courts in this circuit have held that "[w]hile 'inevitable disclosure' can be a viable theory under state law, it appears to be foreclosed for claims under the DTSA." *Aon PLC v. Alliant Ins. Servs., Inc.*, No. 23-CV-03044, 2023 WL 3914886, at *5 (N.D. Ill. June 9, 2023); *see also Admiin Inc. v. Kohan*, No. 23-CV-04430, 2023 WL 4625897, at *12 (N.D. Ill. July 19, 2023).

But WCG's claim under the IUTSA does not fare any better. WCG can point to no relevant case law that supports an inevitable disclosure claim under Indiana state law. In fact, Indiana courts generally disfavor the inevitable disclosure theory, applying it only in the "rare and narrow set of circumstances in which the departing employee has acted in bad faith in taking or threatening to take valuable confidential information from the employer." *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 820 (S.D. Ind. 2007) (citing to *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507 (Ind. 1995)). WCG has not offered any evidence to show that Atkinson and Demo acted in bad faith, or that they threatened to take proprietary information with them before leaving the company.

Ultimately, WCG does not flesh out how it meets the elements of an inevitable disclosure claim, and the Court declines to engage in a comprehensive factual analysis on its own accord. The Court concludes that WCG is unsuccessful in alleging a misappropriation claim under the DTSA or the IUTSA, both for purposes of

injunctive relief under the statute, and as it pertains to its likelihood of success on the merits.

b. Breach of contract

WCG alleges that Atkinson and Demo violated a set of restrictive covenants contained in "Award Agreements" the pair had signed; the agreements granted Atkinson and Demo equity in WCG's holding company, Da Vinci Purchaser Holding, LP. (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. 26–30, ECF No. 32.) The equity-awarding contracts contained non-compete, non-solicitation, and non-disclosure provisions, all of which WCG alleges Defendants violated. *Id.*

Because no federal statute is invoked, WCG's breach of contract claims are governed by state law. The *Erie* doctrine requires that "federal courts applying state law . . . use state substantive law and federal procedural rules." *Sumrall v. LeSea, Inc.,* 104 F.4th 622, 629 (7th Cir. 2024); *see Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "[T]he Supreme Court has made clear that the [*Erie*] doctrine applies equally to state law claims . . . that are brought to the federal courts through supplemental jurisdiction." *Houben v. Telular Corp.,* 309 F.3d 1028, 1032 (7th Cir. 2002). "Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.,* 760 F.3d 674, 684 (7th Cir. 2014). WCG asserts that the Limited Partnership agreement Atkinson and Demo signed contained a Delaware choice of law provision. (Pl.'s Compl. ¶ 50, ECF No. 1.) Interestingly, WCG offers no citation to this agreement in order to demonstrate the existence of the choice

of law clause; in its abundance of exhibits, WCG seems to have left this one out. Because a merits analysis under both Indiana and Delaware law yields the same conclusion, the Court here will presume the choice of law provision exists. Operating under this presumption, "Indiana choice of law doctrine favors contractual stipulations as to governing law," so the Court will analyze the restrictive covenants under Delaware law. *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).

Generally, Delaware's courts are more eager than Indiana's to enforce contractual terms as agreed to by the parties, holding "freedom of contract in . . . reverential regard." *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676–77 (Del. 2024). Still, when it comes to restrictive covenants between employees and employers, Delaware does not "'mechanically' enforce or deny non-competes but 'closely scrutinize[s] [them] as restrictive of trade.'" *Labyrinth, Inc. v. Urich*, No. 2023-0327-MTZ, 2024 WL 295996 (Del. Ch. Jan. 26, 2024) (quoting *FP UC Hldgs., LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020); and then quoting *Centurion Serv. Grp., LLC v. Wilensky*, 2023 WL 5624156, at *2 (Del. Ch. Aug. 31, 2023)). Delaware law requires that a covenant not to compete "(1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable." *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018). WCG's non-compete does not survive this scrutiny.

As drafted, the noncompete provision lasts for twelve months after departure from WCG and prohibits Atkinson and Demo from engaging with any business that conducts "competitive activities . . . within the United States of America or any other jurisdiction in which any of the Company or any of its Subsidiaries engages in business, derives a material portion of its revenues, or has demonstrable plans to commence business activities." (Pl.'s Compl, ¶ 52, ECF No. 1.) A twelve-month noncompete is not necessarily too long if the geographic scope is limited. *See Delaware Elevator, Inc. v. Williams*, 2011 WL 1005181 (Del. Ch. Mar. 16, 2011), judgment entered, (Del. Ch. 2011) ("When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together."). But WCG's business is "global in scope" spanning throughout the "United States, European Union, and Asia Pacific," (Pl.'s Compl. ¶ 2, ECF No. 1), meaning the non-compete intends to prevent Atkinson and Demo from taking *any* job at any "healthcare or related institution" involved in "competitive activities" and based in any relevant areas of America, the E.U., or the Asia-Pacific. (Pl.'s Reply Br. in Supp of Mot. for Prelim. Inj. 9, ECF No. 54.) WCG claims that the agreement's seven-part definition of "competitive activities" significantly narrows its scope, (Pl.'s Reply Br. in Supp of Mot. for Prelim. Inj. 8, ECF No. 54); to this, the Court quotes the Court of Chancery: "[t]hat is a pile of words." *Sunder Energy, LLC v. Jackson*, 305 A.3d 723 (Del. Ch. 2023), aff'd in part, rev'd in part, No. 455, 2023, 2024 WL 5052887 (Del. Dec. 10, 2024). It seems that upon leaving WCG, Atkinson and Demo, professionals in the clinic-trial space, were expected to find a job at a company

essentially unrelated to the healthcare industry, or otherwise remain unemployed for twelve months. The Court cannot see how this agreement possibly comports with the values of the Delaware courts, namely the "encouragement of competition and discouragement of restraints on trade, the recognition of an individual's right to choose her employment, and the desire to avoid oppressive or unclear obligations arising from contracts of adhesion." *Hub Grp., Inc. v. Knoll*, No. 2024-0471-SG, 2024 WL 3453863, at *1 (Del. Ch. July 18, 2024), *appeal refused*, No. 337, 2024, 2024 WL 4343006 (Del. Sept. 30, 2024).

In its reply brief, WCG gestures to the fact that Atkinson and Demo's roles as shareholders in WCG's parent company could allow for a broader noncompete provision. In support, WCG includes several citations to Indiana case law, which are inapposite given the operative choice of law provision, along with a few Delaware cases that are not quite on point. The first, *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210 (Del. Ch. July 22, 2015), involved the alleged breach of restrictive covenants contained in a contract entered into by defendant when he sold his stake in several businesses to plaintiff; WCG directs the Court's attention to the following language: "[i]f the restrictive covenant in question was obtained as 'part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract.'" *Kan-Di-Ki, LLC* at *20 (citations omitted). But the WCG Award Agreements were not contracts for the sale of stock or for the sale of business; rather they were "awards" of equity presumably rendered as partial compensation. There is nothing in *Kan-Di-Ki* indicating that restrictive covenants

11

contained in equity award agreements granted to company executives should be read with the same sort of deference as when such provisions arise from the sale of stock or the business. The other case WCG cites, from the Delaware Supreme Court, deals with a dispute over various restrictive covenants contained in limited partnership, merger, and employment agreements, but contains no language about how ownership/shareholder status affects the validity of such provisions. (Pl.'s Reply Br. in Supp of Mot. for Prelim. Inj. 10, ECF No. 54) (citing to *Bako Pathology LP v. Bakotic,* 288 A.3d 252 (Del. 2022)). Because WCG does not explain how Atkinson and Demo's status as shareholders of WCG's parent company may impact the analysis of the relevant restrictive covenants, the Court declines to take up this vein of analysis.

WCG asserts that it has adequately alleged legitimate economic interests, worthy of protection by such an agreement, in its "customers, trade secrets, confidential and proprietary information, and good will are legitimate and worthy of protection." (Pl.'s Reply Br. in Supp of Mot. for Prelim. Inj. 7, ECF No. 54). While Delaware courts have recognized "protection of employer goodwill and protection of employer confidential information" as legitimate economic interests in the context of non-competes, the Court does not believe that WCG has identified any especially strong concerns to demonstrate that the vast scope of this agreement is "essential for the protection of [its] economic interest," nor has it demonstrated that the balance of equities weighs in its favor. *Rsch. & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *7 (Del. Ch. Nov. 18, 1992); *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998). WCG's non-compete is overbroad, both in geographic scope

and scope of conduct, "casting a limitless net" over Atkinson and Demo. *Centurion Serv. Grp., LLC v. Wilensky*, No. CV 2023-0422-MTZ, 2023 WL 5624156, at *4 (Del. Ch. Aug. 31, 2023) (finding unenforceable a non-compete spanning "any area within the United States of America, and any other countries within the world where the Company is then actively soliciting and engaging in (or actively planning to solicit and engage in) the Business."); *see generally Hub Grp., Inc. v. Knoll*, No. 2024-0471-SG, 2024 WL 3453863, at *11-12 (Del. Ch. July 18, 2024), *appeal refused*, No. 337, 2024, 2024 WL 4343006 (Del. Sept. 30, 2024) (finding overbroad a non-compete agreement narrower in scope than WCG's.)  The Court need not and now declines to engage in a lengthy analysis of the balance of equities, given the findings on the other factors.  Ultimately, it is the Court's view that WCG's non-compete provision is likely unenforceable under Delaware law, and a claim for its violation is unlikely to succeed on the merits.

The analysis for the enforceability of non-solicitation agreements requires the Court to consider the same factors as that for non-compete provisions: scope; the employer's legitimate economic interests; and balance of equities.  *See Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 958 (Del. Ch. 2020).  WCG's non-solicitation agreement states as follows:

> [T]he Executive shall not, directly or indirectly: (a) encourage, induce, hire or solicit or seek to induce, hire or solicit any person engaged with the Company or its Subsidiaries as an employee, agent, independent contractor (or any such person that was so engaged during the one-year period immediately preceding such initial inducement or solicitation during the Term)… to end his or her engagement or employment with the Company or its Subsidiaries, or . . . (b)(i) solicit, encourage or induce any customer, supplier or client of the Company or its Subsidiaries to reduce or refrain from doing any business with the Company or its

Subsidiaries, (ii) interfere with (or attempt to interfere with) any relationship between the Company or its Subsidiaries and any of their respective customers, suppliers or clients (or any person or entity in respect of which the Executive is aware that the Company or its Subsidiaries has approached or has made significant plans to approach as a prospective customer, supplier or client), or (iii) aid other person or entities involved in such acts.

(Ex. 3, Atkinson and Demo's Award Agreements, ECF No. 1-3 at 7.)

As to the employee non-solicitation provision, the Delaware Court of Chancery in a comparable case held that "if the Personnel Restriction . . . (i) only restricted [employee], (ii) only lasted for a reasonable time, (iii) only applied to current [company] personnel, and (iv) only restricted recruiting existing personnel for another business," then it could be found reasonable. *Sunder Energy, LLC v. Jackson*, 305 A.3d 723 (Del. Ch. 2023), *aff'd in part, rev'd in part*, No. 455, 2023, 2024 WL 5052887 (Del. Dec. 10, 2024).[1]  But in *Sunder,* the Court concluded that "[a]s written, [the provision] is overly broad.  In conjunction with the other Covenants, it is oppressive." *Id.* WCG's personnel restriction suffers the same fate.  While the provision restricts only Atkinson and Demo and lasts for what is arguably a reasonable time (twelve months), it applies to essentially *anyone* WCG or its Subsidiaries currently employ or employed in the year preceding a breach, and it

---

[1] In *Sunder Energy, LLC v. Jackson*, the Delaware Supreme Court reversed only the part of the Chancery Court's opinion that declared the entire LLC operating agreement unenforceable as to all signatories as a matter of law, holding that this was an inappropriate finding at the preliminary injunction stage. 2024 WL 5052887 (Del. Dec. 10, 2024). At the same time, the Delaware Supreme Court signaled its agreement with the Chancery Court's finding of overbreadth as to the agreement's noncompete and employee/customer non-solicitation covenants. *See Sunder Energy, LLC* 2024 WL 5052887, at *11.

prohibits too broad a slate of activity. For example, imagine an employee "leave[s] the [clinical trial] industry entirely and join[s] a non-profit . . . [Atkinson and Demo] would have breached the Personnel Restriction if [they] . . . discuss[ed] whether joining a non-profit would be more personally rewarding and aligned with that person's values." *Id.* at 759. It is likely that the employee non-solicitation provision to which Atkinson and Demo agreed is overbroad under Delaware law, and thereby a claim under it unlikely to succeed on the merits.

WCG's customer non-solicitation provision is arguably also overbroad in its inclusion of current *and* prospective customers, neither of which are limited to clients Atkinson and Demo worked with or were in the process of recruiting. *See Sunder Energy,* 305 A.3d at 757 (Del. Ch. 2023). Regardless, while WCG alleges that "Atkinson and Demo also violated the non-solicit by soliciting business from their former WCG customers and helping Sitero Personnel with soliciting business from WCG customers," (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. 29, ECF No. 32), it does not actually present any supporting evidence for this claim. Instead, WCG cites to page 22 of its own brief, which contains no discussion of the solicitation of WCG clients by Sitero, and to support its allegation that Atkinson and Demo were soliciting clients "on the backend," a citation to ECF No. 31-72, an exhibit that in fact does not contain this quote. All this to say, were it the case that a Delaware court would uphold WCG's customer non-solicitation provision, because the record is devoid of any evidence of actual breach of the customer non-solicitation provision, WCG is still unlikely to succeed on the merits of such a claim.

Finally, as to the alleged violation of the non-disclosure provision, WCG points to various exhibits that purportedly prove that Atkinson and Demo used or disclosed confidential information to benefit Sitero. (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. 30, ECF No. 32.) As discussed in the context of WCG's trade secret misappropriation claim, there is no evidence that Atkinson and Demo disclosed or used any confidential information while working at Sitero. The swath of emails to which WCG cites in support does little to bolster its allegations.

One such referenced email contains a short message from a Sitero employee discussing how Atkinson worked her "magic" to help the group better target institutional review board customers; nothing in the email indicates that she disclosed WCG proprietary information to do so. (Ex. 58, ECF No. 34). In another, Atkinson writes that she and Demo "learned a lot from the Bausch bid defense" which would help in gaging pricing and preparing a draft for an entirely different prospective Sitero customer, (Ex. 41, ECF No. 34). While Atkinson and Demo may have worked on Bausch while at WCG, there is nothing prohibiting them from using learned experience to inform their work on a new project involving a different client, and nothing indicating they revealed proprietary WCG information in the process. WCG's strongest piece of evidence contains a message from Sitero's Vice President of Research Compliance Services about reaching out to people Atkinson and Demo are "familiar with at CROs to message partnering on their next bid," (Ex. 58, ECF No. 34). The Court infers that "CRO" stands for contract research organization, (*see* Defs.' Resp. in Opp'n. to Pl.'s Mot. for Prelim. Inj. 8, ECF No. 49,) and it seems that WCG

works with CROs in its business, (https://www.wcgclinical.com/solutions/cros/). Still, nothing in this email suggests that Sitero expects Atkinson and Demo to target clients they are specifically "familiar with" through WCG, or if so, to reveal any confidential information in the process.

Ultimately, these emails are not enough to indicate that Atkinson or Demo disclosed proprietary WCG information at any point after leaving the company. The Court finds that WCG has not demonstrated a likelihood of succeeding on the merits of its claim that Atkinson and Demo violated the non-disclosure provision, regardless of its validity under Delaware law.

ii.  <u>Irreparable harm</u>

On the question of irreparable harm, WCG alleges that "Defendants' actions have already, and will continue to, result in loss of proprietary information and trade secrets, reputation, and customer and employee goodwill. These losses are irreparable." (Pl.'s Br. in Supp. of Prelim. Inj. 24, ECF No. 32.) Plaintiff also refers to an irreparable harm provision in Atkinson and Demo's restrictive covenants, alongside some friendly Delaware law, as additional evidence for having met this requirement. (*Id.*) In a 30+ page brief, this is the extent of Plaintiff's discussion on irreparable harm.

The Seventh Circuit has held that "[i]n some cases, a former employee's use of an employer's confidential information could support a finding of irreparable harm to the former employer," but it must be accompanied by an identifiable threat of irreparable harm that cannot be alternatively remedied. *DM Trans, LLC v. Scott*, 38

F.4th 608, 621 (7th Cir. 2022).  Here, there is no evidence that Atkinson or Demo currently possess any confidential WCG documents or files, nor that they have disclosed confidential WCG information during their employment at Sitero. Consequently, there is no identifiable impending threat of irreparable harm to WCG. The risk of Atkinson or Demo employing knowledge and skills gained from years of experience at WCG in their new positions at Sitero is, for better or worse, the cost of doing business.  Besides, industry skills acquired while working at WCG, along with any knowledge about customers or practices stored in the repository of one's mind, will not disappear after a year's time.

While the loss of customer goodwill can, in some contexts, constitute irreparable harm, the Court in this case is not convinced.  *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (finding that loss of consumer goodwill constituted irreparable harm for purposes of injunctive relief where defendant, a market competitor, embedded in its website a meta-tag to plaintiff's trademarked product in an effort to manipulate user search traffic).  WCG explains that Atkinson, and Demo as her subordinate, worked closely with the company's customers to develop WCG's unique InvestigatorSpace product and market it as part of WCG's clinical-trial safety offerings.  (Pl.'s Br. in Supp. of Prelim. Inj. 9-10, ECF No. 32.) Now, WCG is convinced that Atkinson, as chief commercial officer at Sitero, will build up Sitero's safety department and subsequently lure customers away from WCG. (Pl.'s Br. in Supp. of Prelim. Inj. 13, ECF No. 32.)  Although Sitero itself does not offer a product comparable to WCG's InvestigatorSpace, it partners with a third-party

company to offer LifeSphere, which WCG alleges is competitive with InvestigatorSpace and which it believes Atkinson will help integrate into Sitero's current safety offerings and market the integrated product to WCG's current customers. (Pl.'s Br. in Supp. of Prelim. Inj. 12-13, ECF No. 32.)

WCG cites to nothing in the evidentiary record that provides even an inkling of suspicion to substantiate the company's fears. The two lines of Kristin Giffin's (General Manager of WCG's Training and Safety Department) deposition that WCG cites to merely state that Atkinson had "deep knowledge" of the InvestigatorSpace product, but offer no independent corroboration for WCG's assertion that Atkinson is poised to use that knowledge in developing a similar product at Sitero. WCG's musings about Atkinson's intentions are pure speculation. WCG cannot point to any clients who have been approached by Atkinson or Demo since they began their employment at Sitero, nor those whom WCG has lost or is at impending risk of losing to Sitero. Atkinson has testified that she has not been in contact with anyone from LifeSphere, nor has she heard references to the product or its parent company while working at Sitero. (Ex. 3, Atkinson Dep. Tr. 134:24-–135:8, ECF No. 44-1 at 36-37.)

Cases in this circuit have found irreparable harm stemming from loss of consumer goodwill when goodwill is stolen through trademark infringement, which is not alleged here, or when an ex-employee actively solicits an employer's customers, which is not evidenced here. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *Holbrook Mfg LLC v. Rhyno Mfg. Inc.,* 497 F. Supp. 3d 319, 334 (N.D. Ill. 2020); *Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007). This

case does not fit the bill. Ultimately, WCG has not made a showing that it is at risk of irreparable harm stemming from the loss of customer goodwill.

In a final hail-Mary, WCG directs the Court's attention to a provision in Atkinson and Demo's restrictive covenants which states "that a breach of any covenant contained in this Agreement would cause the Company irreparable damage for which damages at law would not be an adequate remedy." (Pl.'s Br. in Supp. of Prelim. Inj. 24, ECF No. 32) (citing to ECF No. 1-1 at 14 § 10.) Delaware courts have come out on both sides of the issue of whether such a contract provision is sufficient for a court to find irreparable harm, but none have held such a clause to mandate a finding of irreparable harm, absent further indicia of irreparable harm. *Compare Vitalink Pharm. Servs., Inc. v. Grancare, Inc.,* No. 15744, 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997) (finding that the provision "alone suffices to establish the element of irreparable harm"); *SLC Beverages, Inc. v. Burnup & Sims, Inc.*, No. CIV.A. 8860, 1987 WL 16035, at *2 (Del. Ch. Aug. 20, 1987) (finding that defendant having agreed to the contract "cannot now assert that plaintiff cannot seek to [enforce the irreparable harm provision]"), *with Kansas City S. v. Grupo TMM, S.A.,* No. CIV.A. 20518-NC, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) ("If the facts plainly do not warrant a finding of irreparable harm, this Court is not required to ignore those facts."); *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. CV 7639-VCN, 2016 WL 787929, at *2 (Del. Ch. Feb. 19, 2016) ("such a provision does not deprive the Court of its discretion with respect to one of the critical forms of equitable relief"). Because the facts indicate that WCG is not at risk of suffering irreparable harm, even

assuming the contract stipulation lessens WCG's burden, the Court declines to conclude that WCG has shown irreparable harm through the contract provision alone.

### iii.    Alternative legal remedies

WCG argues that a preliminary injunction is the only remedy for potential loss of goodwill and reputation, and trade secret misappropriation, (Pl.'s Br. in Supp. of Prelim. Inj. 33). But WCG has not shown that they have or are likely to suffer such loss, nor that they are likely to succeed on a misappropriation claim. Were they to succeed on the latter, WCG could sue for damages stemming from actual loss or unjust enrichment. *See* Ind. Code 24-2-3-4; 18 U.S.C. § 1839(b)(3)(B).

Otherwise, if WCG can show that their restrictive covenants are valid under Delaware law, and that Atkinson and Demo breached them, they can seek damages for lost profits. *See Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021 WL 3575709, at *57 (Del. Ch. Aug. 13, 2021), judgment entered, (Del. Ch. 2021)("A standard measure of damages that courts deploy in cases involving breaches of restrictive covenants [are] the profits that the venture could have obtained but for the prohibited conduct"); *Base Optics Inc. v. Liu,* 2015 WL 3491495, at *16 (Del. Ch. May 29, 2015)("In the context of a breach of a non-compete agreement, lost profits from business within the scope of the parties' non-compete are direct, not consequential damages"); *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)("The Plaintiff is thus entitled…to any profits earned by the Defendants that may be attributed to the breach of the Non–Competition Agreement.")

iv.  Balance of harms

Because WCG failed to successfully show the three baseline elements of a preliminary injunction, the Court need not reach the balancing-of-harms analysis. *See Courthouse News Servs.*, 908 F.3d at 1067.

It is worth noting that the Court is uncertain how putting Atkinson and Demo "on the bench . . . for the duration of their contractual obligations," in other words enjoining them from working at Sitero for the next four or so months, will alleviate WCG's alleged concerns about trade secret use and loss of customer goodwill.  (Pl.'s Reply Br. in Supp of Mot. for Prelim. Inj. 24, ECF No. 54.) WCG claims "the 12-month restrictive period would allow [it] to entrust Atkinson's and Demo's customers to their new WCG contacts, and safeguard use of any business strategies that were in progress at the time they left."  (Pl.'s Br. in Supp. of Prelim. Inj. 27, ECF No. 32). This vague plan of action does not seem fit to remedy WCG's alleged concerns. Whether WCG seeks for the Court to enforce the entire year-long restrictive covenant anew is unclear from its filings; regardless, this Order makes clear that WCG has not met the burden for a preliminary injunction.

While WCG's frustration over losing executive-level employees to a competitor is understandable, based on the evidentiary record and the Parties' briefs, preliminary injunctive relief is not justified.

## III.  Conclusion

WCG's motion for a preliminary injunction, (ECF No. 8), is **denied**.  Defendants' motion for oral argument on the injunction, (ECF No. 50), is **denied as moot.**

**SO ORDERED.**

Date:   1/15/2025

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Justin A Allen
Ogletree Deakins Nash Smoak & Stewart, P.C.
justin.allen@ogletree.com

Marisa L. Berlinger
Morgan Lewis
marisa.berlinger@morganlewis.com

Mark F. Criniti
SouthBank Legal
mcriniti@lck-law.com

Erin Linder Hanig
SouthBank Legal
ehanig@lck-law.com

August W. Heckman, III
Morgan Lewis
august.heckman@morganlewis.com

Patrick Joseph O'Rear
SouthBank Legal
porear@southbank.legal